Receipt number AUSFCC-8236645

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| JOHN BOYD, JR., KARA BOYD, LESTER BONNER, and PRINCESS WILLIAMS, individually and on behalf of all others similarly situated, | Case No. __22-1473 C__ |
| Plaintiffs, | |
| v. | **CLASS ACTION COMPLAINT** |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

Plaintiffs, John Boyd, Jr., Kara Boyd, Lester Bonner, and Princess Williams (collectively, "Plaintiffs," unless otherwise identified), individually and on behalf of the other members of the below-defined classes, which include Black, Native American, and Hispanic farmers, among others, seek justice for the blatant breaches of their contractual rights by the United States of America ("Defendant" or the "U.S. Government") arising from the Inflation Reduction Act ("IRA"), Pub. L. No. 117-169.  Plaintiffs allege, upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters, based upon the investigation of counsel, as follows:

### I.    INTRODUCTION

1.    Plaintiffs are socially disadvantaged farmers ("SDFs"), as defined in §§ 1005–1006 of the American Rescue Plan Act ("ARPA"), Pub. L. No. 117-2.

2.    SDFs belong to groups that have traditionally suffered racial or ethnic prejudice.  Such groups include, but are not limited to: Native Americans or Alaskan Natives; Asians; Blacks or African Americans; Native Hawaiians or other Pacific

Islanders; and Hispanics or Latinos.[1]

3.      Through § 1005, ARPA required the United States Department of Agriculture ("USDA") to relieve specified types of debt held by SDFs.  In § 1006, ARPA provided compensation for SDFs who previously suffered discrimination at USDA's hands.

4.      After ARPA's enactment, USDA designed form letters to send to SDFs eligible for debt relief under § 1005, such as Mr. Bonner and Ms. Williams (collectively, the "Relief Plaintiffs").

5.      The letters included a contractual offer:  USDA would pay off the amount of debt listed in the letter if SDFs accepted USDA's calculation of their eligible debt and waived their right to appeal it.

6.      Relief Plaintiffs, and other SDFs, accepted USDA's offer.  Further, as the U.S. Government intended, they maintained or expanded their operations, supporting the U.S. Government's COVID-19 pandemic response efforts, which sought to strengthen America's food supply chain during a time of crisis.

7.      But the U.S. Government broke its promise and breached its contractual obligations.  Not only did it fail to pay SDFs' eligible debt, but it also repealed § 1005 of ARPA via the IRA, in a blatant attempt to skirt its contractual commitments to Relief Plaintiffs and other SDFs.

---

[1] Notice of Funds Availability, American Rescue Plan Act of 2021 Section 1005 Loan Payment, 86 Fed. Reg. 28329-01.

8.     The impact of the U.S. Government's breach has been devastating.  Relief Plaintiffs and other SDFs, reasonably relying on the U.S. Government's contractual commitments, invested in new equipment or land after they entered their ARPA contracts with the U.S. Government.  Now, as a result of the U.S. Government's breach of its contractual obligations, Relief Plaintiffs and other SDFs cannot service the debt the U.S. Government contractually committed to pay and risk losing their farms and their livelihoods as a result of the U.S. Government's wrongful conduct.

9.     But the U.S. Government's contractual breaches to SDFs did not stop there.

10.     Before ARPA's enactment, victims of USDA discrimination such as John and Kara Boyd (collectively, the "Discrimination Plaintiffs"), had litigated discrimination claims for years.

11.     They also lobbied the U.S. Government to provide compensation for the discrimination they, and other SDFs, had suffered.

12.     Through their lobbying efforts and their direct conversations with powerful government officials, Discrimination Plaintiffs impliedly offered the U.S. Government a deal: they would cease their discrimination litigation if the U.S. Government provided statutory compensation to SDFs who had suffered discrimination in ARPA.

13.     The U.S. Government accepted the offer when it passed § 1006, creating an implied contract with Discrimination Plaintiffs and similarly-situated SDFs.

14.     Then, the U.S. Government breached its contract by passing the IRA, which amended § 1006 such that it no longer provides compensation earmarked for SDFs who have suffered discrimination.

3

15.     By this action, Relief Plaintiffs, individually and on behalf of each of the other members of the below-defined "Relief Class," seek relief from the U.S. Government for breach of contract and breach of implied contract,[2] in amounts to be determined at trial.

16.     Similarly, Discrimination Plaintiffs, individually and on behalf of each of the other members of the below-defined "Discrimination Class," seek relief from the U.S. Government for breach of implied contract, in amounts to be determined at trial.

17.     All Plaintiffs, by this action, ask the Court to defend the principle that no party may unilaterally opt out of its own contractual obligations.

## II.     JURISDICTION AND VENUE

18.     Under the Tucker Act, 28 U.S.C. § 1491, this Court has jurisdiction over this action and venue is proper because this suit asserts claims for breach of contract and breach of implied contract against the United States of America.

## III.     PARTIES

19.     John Boyd, Jr., is a Black farmer and an SDF, as defined by §§ 1005–1006 of ARPA, Pub. L. No. 117-2, and § 2501(a) of the Food, Agriculture, Conservation, and Trade Act of 1990, 7 U.S.C. 2279(a).  He lives in Baskerville, Virginia, with his wife, Kara Boyd.  The Boyds own and operate a 1,500-acre farm on which they grow soybeans, corn, wheat, hemp, and other produce.  They also raise beef cattle, guinea hogs,

---

[2] Relief Plaintiffs understand the "existence of an express contract precludes the existence of an implied contract dealing with the same subject." *Atlas Corp. v. United States*, 895 F.2d 745, 754 (Fed. Cir. 1990).  Accordingly, they plead their breach of implied contract claim in the alternative to their breach of contract claim.  RCFC 8(d)(2) ("A party may set out 2 or more statements of a claim . . . alternatively or hypothetically.").

goats, and chickens.  Mr. Boyd is the founder of the National Black Farmers Association ("NBFA").

20.     Kara Boyd is a Native American farmer and an SDF, as defined by §§ 1005–1006 of ARPA, Pub. L. No. 117-2, and § 2501(a) of the Food, Agriculture, Conservation, and Trade Act of 1990, 7 U.S.C. 2279(a).  She lives in Baskerville, Virginia, with her husband, John Boyd, Jr.  She and her husband own and operate a 1,500-acre farm, as described above.  Ms. Boyd is an Air Force veteran and the founder of the Association of American Indian Farmers ("AAIF").

21.     Lester Bonner is a Black farmer and an SDF, as defined by §§ 1005–1006 of ARPA, Pub. L. No. 117-2, and § 2501(a) of the Food, Agriculture, Conservation, and Trade Act of 1990, 7 U.S.C. 2279(a).  He is an Army veteran who owns and operates a 113-acre wheat farm in Dinwiddie, Virginia, and also rents land on which he grows wheat and beans.

22.     Princess Williams is a Black farmer and an SDF, as defined by §§ 1005–1006 of ARPA, Pub. L. No. 117-2, and § 2501(a) of the Food, Agriculture, Conservation, and Trade Act of 1990, 7 U.S.C. 2279(a).  She is a Navy veteran who owns and operates a 73-acre farm in Lovingston, Virginia, on which she and her four children grow apples, melons, pumpkins, beans, onions, and potatoes.

23.     Defendant is the United States of America, acting through Secretary of Agriculture Thomas Vilsack ("Secretary" or "Secretary Vilsack") and USDA, as well as their employees and agents.

## IV.    <u>FACTUAL ALLEGATIONS</u>

**A.    The U.S. Government Breached a Contract Arising from § 1005 of the American Rescue Plan Act.**

### 1.    *The Farm Service Agency Provides Loans for Socially Disadvantaged Farmers.*

24.    USDA's Farm Service Agency ("FSA") offers direct and guaranteed loans to farmers and ranchers to promote the United States' agricultural economy.

25.    Direct farm loans are designed to help farmers start new farms or expand existing ones.  They are frequently used by farmers with a limited financial history. Farmers who have suffered financial setbacks or natural disasters also often take advantage of FSA's direct loan program.

26.    Guaranteed farm loans are available to farmers who might not otherwise qualify for loans from commercial lenders.  While those loans are made and serviced by such lenders, FSA guarantees the loans and protects the lenders from specified amounts of loss.  FSA also oversees lenders' activities associated with guaranteed farm loans.

27.    FSA seeks to ensure some of its loans benefit SDFs.  SDFs, historically, have experienced intentional and race-based barriers in obtaining the financial assistance necessary to start or maintain farms.  By expanding SDFs' access to loans, FSA attempts to address that historic injustice, in part.

28.    Individuals who apply for, or retain, FSA loans have the right to appeal any "administrative decision made by an officer, employee, or committee of [FSA] that is adverse."  7 C.F.R. § 11.1, *et seq*.

29.     Federal regulations describe the process that individuals appealing FSA decisions can pursue, which can culminate in a decision that is "reviewable and enforceable by any United States District Court of competent jurisdiction." *Id.* § 11.13.

### 2.     *The American Rescue Plan Act Authorized Debt Relief for Socially Disadvantaged Farmers.*

30.     On March 11, 2021, President Joseph Biden signed ARPA into law.  Through ARPA, the U.S. Government sought to stimulate the economy and assist in the country's recovery from the impacts of the COVID-19 pandemic.

31.     Agriculture was one of the key sectors that ARPA targeted.  It appropriated billions of dollars to programs designed to strengthen the United States' farming system. With ARPA's assistance, the U.S. Government hoped that farmers would maintain or expand their operations, supporting America's economy and its food supply chain.

32.     ARPA included a provision related to SDFs.   Under § 1005, ARPA established that the Secretary "shall provide a payment in an amount up to 120 percent of the outstanding indebtedness" of each SDF, held "as of January 1, 2021," arising from "direct farm loan[s] made by the Secretary" and "farm loans guaranteed by the Secretary."

33.     Fourteen days after ARPA's enactment, on March 25, 2021, Secretary Vilsack appeared before the House of Representatives' Committee on Agriculture at a "Hearing to Review the State of Black Farmers in the U.S."[3]

---

[3] Transcript, A Hearing to Review the State of Black Farmers in the U.S., Committee on Agriculture, U.S. House of Representatives, www.congress.gov/event/117th-congress/house-event/LC67546/text?s=1&r=61 (last visited October 2, 2022).

34.     During his opening statement, Secretary Vilsack discussed ARPA and SDFs. He said that "[c]reating more equitable opportunities for Black farmers is a rising tide that can lift all boats," noting that a study had found closing racial gaps in lending opportunities would boost gross domestic product and create more jobs.  He also said that "prosperous farmers of color means a prosperous agricultural sector and a prosperous America."

### 3.     *The U.S. Government Offered Contracts for Debt Relief in FSA-2601.*

35.     Following ARPA's enactment, USDA designed a system intended to implement § 1005's requirements.  Part of USDA's system included the use of a form letter, FSA-2601, which included a contractual offer.[4]  USDA sent FSA-2601s to Relief Plaintiffs and other SDFs.

36.     The FSA-2601s told recipients they were "eligible for payment" under ARPA.  They also attached a worksheet with "detailed calculations for [the SDFs'] eligible direct loan debt."  However, the FSA-2601s also said that "[a]fter your ARPA-eligible direct loans are paid in full, you will still be indebted to FSA for loans [that] are not eligible for ARPA."

37.     The FSA-2601s informed recipients—including Relief Plaintiffs—that they could "select one of . . . three options."

38.     Option 1 required SDFs to "accept the ARPA payment as calculated by FSA for [their] FSA debt."  It also required SDFs to acknowledge and agree to a list of

_____

[4] A copy of FSA-2601 is attached to this Complaint as Exhibit 1.  The copy provided is a sample publicly available at https://omb.report/icr/202105-0560-003/doc/111787000 (last visited October 2, 2022).  The form language in the document is identical to that found in the FSA-2601s sent to Relief Plaintiffs and other Relief Class members.

conditions.  FSA-2601 made clear that if SDFs selected Option 1, "[a]ll of [their] eligible direct loan debt [would] be paid in full."  And it indicated that SDFs could receive their debt relief in a matter of "weeks."  Finally, Option 1 informed SDFs that if the U.S. Government received "at least one, but not all, required signatures," it would notify individuals who did not sign of their "appeal rights" and process payment within 30 days if "an appeal is not requested."

39.    Option 2 was for SDFs who wanted to "schedule a meeting with the local FSA office."  The form said that SDFs should select Option 2 "to discuss the loan calculation, or if an error is identified," among other things.

40.    Option 3 was for SDFs who "[did] not want to receive the ARPA payment." Selecting this option was a "final and irrevocable" decision.

41.    In designing and distributing FSA-2601, the U.S. Government sought to induce SDFs to select Option 1 so that they would waive their right to challenge or appeal USDA's debt eligibility calculation, accept quick debt relief, and maintain or expand their farming operations to support the U.S. Government's pandemic response and recovery efforts.

42.    These goals are reflected in, among other things, public and private statements made by Secretary Vilsack and other U.S. Government employees before and after ARPA's enactment.

### 4.    The U.S. Government's Conduct and Representations Regarding FSA-2601 Made Clear It Intended to Be Bound in Contract.

43.    In its conduct, its representations to SDFs, its public disclosures, and its

communications with its employees and agents, the U.S. Government consistently and clearly asserted that it considered the FSA-2601s to be contracts binding on SDFs and on the U.S. Government.

44.     After ARPA's enactment, USDA circulated Notice FSFL-178 (the "Notice") to its state and county offices.  The Notice concerned FSA-2601.

45.     Under a section titled "**Notification to Borrower and Agreement**," the Notice explained that FSA-2601 would "serve as [USDA's] **offer letter**" under § 1005 and "be used to notify known [SDF] borrowers of the ARPA offer amount."[5]

46.     It also said that SDFs would "use FSA-2601 to do one of the following": "accept the offer and conditions," "schedule a meeting to discuss with FSA before making a decision," or "decline the offer."

47.     According to the Notice, SDFs who disagreed with FSA's loan payment calculations after meeting with FSA would "be provided with appeal options."

48.     The Notice attached an "example of FSA-2601 (offer letter)."  It cautioned that "State and County Offices are **not** authorized to create or modify the offer letter which includes the payment calculation worksheet."

49.     USDA also published, after ARPA's enactment, a Notice of Funds Availability concerning the FSA-2601s.[6]  It described the utility of FSA-2601s in much the same terms as the Notice.  It emphasized, regarding FSA-2601s, that "[a]cceptance of the

---

[5] The terms bolded herein were bold in the Notice itself.  The Notice is publicly available at www.fsa.usda.gov/Internet/FSA_Notice/fsfl_178.pdf (last visited October 2, 2021).

[6] Notice of Funds Availability, American Rescue Plan Act of 2021 Section 1005 Loan Payment, 86 Fed. Reg. 28329-01.

offer indicates concurrence with the payment calculations and the indicated distribution of funds."

50.     FSA employees conveyed this same message to SDFs.  After receiving her FSA-2601, Ms. Williams spoke to an FSA representative about it.  The representative informed Ms. Williams that selecting Option 1 would lock her into the U.S. Government's payment calculation.  The representative also communicated that selecting Option 1 was in Ms. Williams' best interests.

**5.      Relief Plaintiffs Accepted, and Relied Upon, the U.S. Government's Contractual Offer.**

51.     Relief Plaintiffs and other SDFs returned their FSA-2601s to the U.S. Government with Option 1 selected, thereby binding themselves and the U.S. Government in contract.

52.     After returning their FSA-2601s, and because of the U.S. Government's contractual guarantees to them under ARPA, Relief Plaintiffs and other SDFs made various farm-related expenditures, including purchasing additional equipment and land.

53.     Mr. Bonner's case is an illustrative example.  Mr. Bonner received an FSA-2601 in or around June 2021.  The form listed Mr. Bonner's "Calculated ARPA Payment" as $24,749.33.

54.     After reviewing the form, Mr. Bonner consulted with others close to him.  He believed that he might be eligible for more debt relief than the amount listed in the letter.  However, because he wanted access to relief as soon as possible, he returned the form with Option 1 selected shortly after receiving it.

55.     After returning his FSA-2601, Mr. Bonner expanded his farming operation. He believed he could afford to do so because debt relief was forthcoming.  He purchased a tractor, a hay baler, and two hay combines.

56.     Ms. Williams' case is markedly similar.  She received an FSA-2601 in or around July 2021.  The form indicated that Ms. Williams would receive $373,154.18 in total relief.  Shortly after receiving it, Ms. Williams returned her form with Option 1 selected.

57.     Next, because Ms. Williams believed that debt relief was on the way, she invested in her farm.  She rented tree-planting machinery, bought and planted apple trees, and had the heating system in her farmhouse fixed, among other things.

> **6.     The U.S. Government Breached the FSA-2601 Contracts and Damaged Relief Plaintiffs and Other SDFs by Partially Repealing ARPA.**

58.     On August 16, 2022, nearly a year and a half after enacting ARPA and promising debt relief for SDFs, President Biden signed into law the IRA, which repealed § 1005 of ARPA.

59.     In repealing § 1005, the U.S. Government made clear that it intended to break the contractual commitments it had made to Relief Plaintiffs and other SDFs regarding the debt relief outlined in the FSA-2601s.

60.     The U.S. Government's breach of its contracts damaged Relief Plaintiffs and other SDFs.  They did not receive the benefit for which they had bargained.  And they suffered financial damage in reliance on the U.S. Government's promises by making purchases they are now unable to afford.

61.     For example, Mr. Bonner cannot afford to run his expanded farming operation.  He lives "paycheck to paycheck" and has had trouble affording basic farming necessities.  During the summer, Mr. Bonner struggled to pay for the fuel needed to run his tractor.  Currently, Mr. Bonner is in foreclosure proceedings that place his livelihood at risk.

62.     Ms. Williams is also struggling.  She cannot afford to pay her mounting bills.  She fears that she and her children will lose their farm.

## B.     The U.S. Government Breached Its Contractual Obligations Arising from § 1006 of the American Rescue Plan Act.

63.     John and Kara Boyd have suffered discrimination at USDA's hands for decades.  It has come in many forms.

64.     For example: USDA refused to process certain loan applications John made for years.  It also foreclosed on farmland he owned much faster than USDA forecloses on white farmers' land.  One time, John even saw a USDA official tear up his loan application and throw it in the trash.

65.     Kara has had similar experiences.  She suffered a discriminatory loan denial.  She was passed over, for racial reasons, a position as a USDA county commission advisor.  And USDA denied her application for crop insurance in circumstances in which it would have granted the application of a white farmer.

66.     The Boyds have fought for relief from the discrimination they have suffered in administrative and court proceedings.

67.     John began litigating discrimination claims against USDA in 1984.  Kara

began litigating discrimination claims against USDA in 2011.

68.    Numerous other SDFs suffered similar discrimination and litigated similar claims within the same timeframes.

69.    The Boyds, and other SDFs, including members of the NBFA and AAIF, also lobbied for statutory relief for the discrimination they have faced.

70.    In advance of ARPA's enactment, they made progress toward their goal.

71.    The Boyds had discussions with U.S. Government officials at the highest levels of power regarding the provisions that would eventually be included in ARPA.

72.    The Boyds and their SDF allies communicated that, if the U.S. Government provided relief in ARPA for SDFs who had suffered USDA discrimination in the past, then they would not pursue such relief via litigation.

73.    The Boyds made this offer clear in their conversations with government officials, including Senator Cory Booker and President Biden.  SDF allies of the Boyds made the same message clear through their lobbying efforts, which included letter, email, and phone campaigns.

74.    The U.S. Government was receptive to the offer.  In fact, U.S. Government officials—including Senator Booker and President Biden—assured the Boyds, personally, that ARPA would include their requested relief.

75.    The U.S. Government accepted the implied contractual offer when it enacted § 1006 of ARPA, which directed USDA to "provide financial assistance to socially disadvantaged farmers, ranchers, or forest landowners that are former farm loan borrowers that suffered related adverse actions or past discrimination or bias in [USDA] programs,"

14

in an amount exceeding $50,000,000.

76.    In reliance on § 1006, the Boyds and other SDFs did not litigate meritorious discrimination claims they could have brought against the U.S. Government.   They believed relief was forthcoming.

77.    However, the U.S. Government broke the promise it made in § 1006.   It passed the IRA, which amended § 1006 of ARPA such that it no longer promised financial assistance for SDFs who previously suffered USDA discrimination.

78.    Although the amended version of § 1006 provides for relief for some victims of discrimination, that relief is no longer set-aside for SDFs, specifically.  Pub. L. No. 117-169, § 22007.  Now, the relief is available for *any* "farmers, ranchers, or forest landowners determined to have experienced discrimination . . . in [USDA] farm lending programs."

79.    This is a transparent attempt to rob SDFs of the compensation they are due. Discrimination Plaintiffs are back where they were before ARPA's enactment.  They have no assurance they will receive the benefits of § 1006 as amended (indeed, if the past predicts the future, Discrimination Plaintiffs and other SDFs have no reason to believe the U.S. Government or USDA will ever provide them the relief that they deserve).

80.    Discrimination Plaintiffs, and other SDFs, did not receive the benefit for which they bargained and are entitled to damages as a result.

## V.    CLASS ACTION ALLEGATIONS
### THE RELIEF CLASS

81.    Relief Plaintiffs bring this action pursuant to Rule 23 of the Rules of the United States Court of Federal Claims, individually and on behalf of all others similarly

15

situated for a class defined as:

> All socially disadvantaged farmers who received FSA-2601, selected Option
> 1 on that form, and returned the form to the U.S. Government before the U.S.
> Government repealed § 1005 of the American Rescue Plan Act.

(the "Relief Class").  Relief Plaintiffs reserve the right to modify or amend the Relief Class

definition, as appropriate, during the course of this litigation.

82.     This action has been brought and may properly be maintained on behalf of

the Relief Class proposed herein under the criteria of Rule 23 of the Rules of the United

States Court of Federal Claims.

83.     **Numerosity – Rule 23(a)(1)**.   The members of the Relief Class are so

numerous and geographically dispersed that joinder of all Relief Class members is

impracticable.  According to FSA program data, as of September 30, 2020 (shortly before

the January 1, 2021, ARPA debt relief cutoff date), 6,582 SDFs held FSA direct or

guaranteed loan obligations.[7]  Thus, while Relief Plaintiffs are informed and believe that

there are thousands of Relief Class members, the precise Relief Class size may be

ascertained from the U.S. Government's own records.   Relief Class members may be

notified of the pendency of this action by recognized, Court-approved notice dissemination

methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published

notice.

84.     **Commonality and Predominance – Rule 23(a)(2) and 23(b)(3)**.   This

---

[7] FSA Farm Loans Program Socially Disadvantaged Obligations Report FY 2020,
www.fsa.usda.gov/Assets/USDA-FSA-Public/usdafiles/Farm-Loan-
Programs/pdfs/program-data/FY2020/FY2020_SDA_Obligations_Report.pdf (last visited
October 2, 2022).

action involves common questions of law and fact, which predominate over any questions affecting individual Relief Class members, including, without limitation:

    a.  Whether the U.S. Government engaged in the conduct alleged herein;

    b.  Whether the U.S. Government's conduct violates applicable law;

    c.  Whether FSA-2601 constituted an express or implied contractual offer;

    d.  Whether selecting Option 1 on FSA-2601, and returning it to the U.S. Government, constituted an acceptance of a contractual offer;

    e.  Whether consideration supported the contracts formed via FSA-2601;

    f.  Whether repealing § 1005 of ARPA breached the parties' contracts; and

    g.  Whether Relief Plaintiffs and the other Relief Class members sustained damages as a result of the U.S. Government's conduct.

85.    **Typicality – Rule 23(a)(3)**.  Relief Plaintiffs' claims are typical of the other Relief Class members' claims.  Relief Plaintiffs and each of the other Relief Class members entered into contracts for debt relief with the U.S. Government.  Relief Plaintiffs' contracts, and all other Relief Class members' contracts, used the same form language.  Relief Plaintiffs and each of the other Relief Class members were subject to the U.S. Government's breach of contract upon its repeal of § 1005 of ARPA.  Accordingly, Relief Plaintiffs' claims arise from the same practices and course of conduct that give rise to the other Relief Class members' claims.

86.    **Adequacy of Representation – Rule 23(a)(4)**.  Relief Plaintiffs will fairly and adequately protect the interests of the Relief Class and have retained counsel who are competent and experienced in class action litigation and Relief Plaintiffs intend to

prosecute this action vigorously.  Relief Plaintiffs have no interests that conflict with or are otherwise antagonistic to other Relief Class members' interests.   The Relief Class's interests will be fairly and adequately protected by Relief Plaintiffs and their counsel.

87.    **Generally Applicable Action – Rule 23(b)(2)**.  The United States acted on grounds generally applicable to the Relief Class by distributing FSA-2601s with the same form language to all Relief Class members and entering into contracts with each of them by virtue of that document.

88.    **Superiority – Rule 23(b)(3)**.  A class action is superior to all other available methods of adjudicating this controversy and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Relief Plaintiffs and the other Relief Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against the U.S. Government, so it would be impracticable for Relief Class members to individually seek redress for the U.S. Government's wrongful conduct.  Even if the Relief Class members could afford to pursue individual litigation, the court system could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of uniform supervision and adjudication by a single judge in a single court.

## THE DISCRIMINATION CLASS

89.     Discrimination Plaintiffs bring this action pursuant to Rule 23 of the Rules of the United States Court of Federal Claims, individually and on behalf of all others similarly situated for a class defined as:

> All socially disadvantaged farmers who were entitled to compensation for past discrimination under § 1006 of the American Rescue Plan Act before the Inflation Reduction Act amended § 1006.

(the "Discrimination Class").  Discrimination Plaintiffs reserve the right to modify or amend the Discrimination Class definition, as appropriate, during the course of this litigation.

90.     This action has been brought and may properly be maintained on behalf of the Discrimination Class proposed herein under the criteria of Rule 23 of the Rules of the United States Court of Federal Claims.

91.     **Numerosity – Rule 23(a)(1)**.  The members of the Discrimination Class are so numerous and geographically dispersed that joinder of all Discrimination Class members is impracticable.  Discrimination Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

92.     **Commonality and Predominance – Rule 23(a)(2) and 23(b)(3)**.  This action involves common questions of law and fact, which predominate over any questions affecting individual Discrimination Class members, including, without limitation:

a.   Whether the U.S. Government engaged in the conduct alleged herein;

b.   Whether the U.S. Government's conduct violates applicable law;

c. Whether Discrimination Plaintiffs' representations to the U.S. Government constituted an implied contractual offer;

d. Whether enacting § 1006 of ARPA constituted an acceptance of a contractual offer;

e. Whether consideration supported the contracts formed via the enactment of § 1006 of ARPA;

f. Whether amending § 1006 of ARPA breached the parties' contracts; and

g. Whether Discrimination Plaintiffs and the other Discrimination Class members sustained damages as a result of the U.S. Government's conduct.

93.   **Typicality – Rule 23(a)(3)**.  Discrimination Plaintiffs' claims are typical of the other Discrimination Class members' claims.  Discrimination Plaintiffs and each of the other Discrimination Class members entered into contracts for discrimination compensation with the U.S. Government.  Discrimination Plaintiffs' contracts, and all other Discrimination Class members' contracts, had the same implied terms.  Discrimination Plaintiffs and each of the other Discrimination Class members were subject to the U.S. Government's breach of contract upon its amendment of § 1006 of ARPA.  Accordingly, Discrimination Plaintiffs' claims arise from the same practices and course of conduct that give rise to the other Discrimination Class members' claims.

94.   **Adequacy of Representation – Rule 23(a)(4)**.  Discrimination Plaintiffs will fairly and adequately protect the interests of the Discrimination Class and have retained counsel who are competent and experienced in class action litigation and Discrimination Plaintiffs intend to prosecute this action vigorously.  Discrimination

Plaintiffs have no interests that conflict with or are otherwise antagonistic to other Discrimination Class members' interests.  The Discrimination Class's interests will be fairly and adequately protected by Discrimination Plaintiffs and their counsel.

95.     **Generally Applicable Action – Rule 23(b)(2)**.  The United States acted on grounds generally applicable to the Discrimination Class by enacting, and then amending, § 1006 of ARPA.

96.     **Superiority – Rule 23(b)(3)**.  A class action is superior to all other available methods of adjudicating this controversy and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Discrimination Plaintiffs and the other Discrimination Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against the U.S. Government, so it would be impracticable for Discrimination Class members to individually seek redress for the U.S. Government's wrongful conduct.  Even if the Discrimination Class members could afford to pursue individual litigation, the court system could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of uniform supervision and adjudication by a single judge in a single court.

## VI.   CLAIMS FOR RELIEF

### COUNT I
**Breach of Contract Arising from the Repeal of § 1005 of ARPA**

97.   The Relief Plaintiffs re-allege and incorporate by reference Paragraphs 1–8, 15, 17–18, 21–62, and 81–88, as if fully set forth herein.

98.   The Relief Plaintiffs bring this Count individually and on behalf of the other Relief Class members.

99.   Relief Plaintiffs and each of the other Relief Class members entered valid, enforceable contracts with the U.S. Government following ARPA's enactment.

    a.  All parties mutually intended to be bound in contract, as shown by ARPA's text, the FSA-2601s, U.S. Government documents, Relief Plaintiffs' and the other Relief Class members' form representations in returning the FSA-2601s, all parties' conduct, and all surrounding circumstances.

    b.  The terms of the parties' contracts were unambiguous, as reflected in the explicit terms of the FSA-2601s and Relief Plaintiffs' and the other Relief Class members' explicit acceptance of those terms.

    c.  Consideration supported both sides of the parties' contracts.   The U.S. Government offered debt relief and, in return, Relief Plaintiffs and the other Relief Class members waived their right to challenge or appeal the U.S. Government's calculation of the amount of debt relief for which they were eligible.  Relief Plaintiffs and the other Relief Class members also accepted the fastest and most efficient form of relief and maintained or expanded their

farming operations, supporting the U.S. Government's pandemic response and recovery efforts.

d. The U.S. Government representatives on whose conduct Relief Plaintiffs and the other Relief Class members relied had actual authority to bind the U.S. Government in contract stemming from § 1005 of ARPA.

100. A duty arose from the U.S. Government's contracts with Relief Plaintiffs and the other Relief Class members. Namely, the U.S. Government was obligated to provide the debt relief to which it agreed in the FSA-2601s.

101. The U.S. Government breached its duty to Relief Plaintiffs and each of the other Relief Class members by failing to provide debt relief as agreed and repealing § 1005 of ARPA.

102. Relief Plaintiffs and the other Relief Class members sustained damages as a result of the U.S. Government's breach. They did not receive the benefit for which they bargained. Furthermore, they suffered reliance damages by making purchases or investments they would not otherwise have made or by permitting interest to accrue on loans that they otherwise would have paid.

## <u>COUNT II</u>
### Breach of Implied Contract Arising from the Repeal of § 1005 of ARPA

103. Relief Plaintiffs re-allege and incorporate by reference Paragraphs 1–8, 15, 17–18, 21–62, and 81–88, as if fully set forth herein.

104. Relief Plaintiffs bring this Count individually and on behalf of the other Relief Class members, in the alternative to Count I.

105.    If Relief Plaintiffs and the other Relief Class members did not enter express contracts with the U.S. Government, implied contracts may be inferred from the conduct and representations of the parties and the surrounding circumstances, as previously set forth.

106.    A duty arose from the U.S. Government's implied contracts with Relief Plaintiffs and the other Relief Class members.  The U.S. Government was obligated to provide the debt relief to which it agreed in the FSA-2601s.

107.    The U.S. Government breached its duty to Relief Plaintiffs and each of the other Relief Class members by failing to provide debt relief as agreed and repealing § 1005 of ARPA.

108.    Relief Plaintiffs and each of the other Relief Class members suffered damages as a result of the U.S. Government's breach of implied contract.  They did not receive the benefit for which they bargained.  Further, they suffered reliance damages by making purchases or investments they otherwise would not have made or by permitting interest to accrue on loans that they otherwise would have paid.

## COUNT III
### Breach of Implied Contract Arising from the Amendment of § 1006 of ARPA

109.    Discrimination Plaintiffs re-allege and incorporate by reference Paragraphs 1–3, 9–14, 16–20, 23, 27, 30, 63–80, and 89–96, as if fully set forth herein.

110.    Discrimination Plaintiffs bring this Count individually and on behalf of the other Discrimination Class members.

111.   Upon ARPA's enactment, Discrimination Plaintiffs and each of the other Discrimination Class members entered valid, enforceable contracts with the U.S. Government that can be inferred from the conduct and representations of the parties and the surrounding circumstances.

    a.   All parties mutually intended to be bound in contract, as shown by Discrimination Plaintiffs' and the other Discrimination Class members' representations to the U.S. Government, the U.S. Government's representations to Discrimination Plaintiffs and Discrimination Class members, the text of § 1006 of ARPA, all parties' conduct, and all surrounding circumstances.

    b.   The terms of the parties' contracts were unambiguous, as reflected in the explicit terms of § 1006 of ARPA.

    c.   Consideration supported both sides of the parties' contracts.   The U.S. Government offered financial assistance and, in return, Discrimination Plaintiffs and Discrimination Class members impliedly agreed not to bring meritorious discrimination claims.

    d.   The U.S. Government representatives on whose conduct Plaintiffs and the other Discrimination Class members relied had actual authority to bind the U.S. Government in contract: those representatives did bind the U.S. Government in contract by passing § 1006 of ARPA.

112.   A duty arose from the U.S. Government's contracts with Discrimination Plaintiffs and the other Discrimination Class members.  Namely, the U.S. Government was obligated to provide the compensation to which it agreed in § 1006 of ARPA.

113.    The U.S. Government breached its duty to Discrimination Plaintiffs and each of the other Discrimination Class members by failing to provide the compensation as agreed and amending § 1006 of ARPA.

114.    Discrimination Plaintiffs and each of the other Discrimination Class members sustained damages as a result of the U.S. Government's breach.  They did not receive the benefit for which they bargained and are entitled to recover the amount they expected under their contract.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the classes they respectively seek to represent, respectfully request that the Court enter judgment in their favor and against the U.S. Government, as follows:

a.    Entering an order certifying the Relief Class and the Discrimination Class, appointing Relief Plaintiffs as representatives of the Relief Class, appointing Discrimination Plaintiffs as representatives of the Discrimination Class, and appointing Plaintiffs' attorneys as Class Counsel for both classes;

b.    Entering a judgment declaring that Relief Plaintiffs and each of the other Relief Class members entered enforceable contracts with the U.S. Government that the U.S. Government breached;

c.    Entering a judgment declaring that Discrimination Plaintiffs and each of the other Discrimination Class members entered enforceable contracts with the U.S. Government that the U.S. Government breached;

d.      Awarding damages to Plaintiffs and each of the members of the classes they

respectively represent in amounts to be determined at trial;

e.      Awarding reasonable attorney's fees and costs; and

f.      Awarding other relief that the Court deems just and proper.

Dated:  October 7, 2022

Respectfully submitted,

 _/s/ Nada Djordjevic_
Nada Djordjevic
Adam J. Levitt*
John J. Frawley*
**DiCELLO LEVITT LLC**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois  60602
Telephone: 312-214-7900
ndjordjevic@dicellolevitt.com
alevitt@dicellolevitt.com
jfrawley@dicellolevitt.com

Diandra Debrosse Zimmermann*
Eli Hare*
**DiCELLO LEVITT LLC**
505 20th Street North, 15th Floor
Birmingham, Alabama  35203
Telephone: 205-855-5700
fu@dicellolevitt.com
ehare@dicellolevitt.com

Éviealle Dawkins*
**DiCELLO LEVITT LLC**
1101 17th Street, N.W., Suite 1000
Washington, DC  20036
edawkins@dicellolevitt.com

Ben Crump*
Chris O'Neal*
**BEN CRUMP LAW PLLC**
122 South Calhoun Street

Tallahassee, Florida 32301
court@bencrump.com
chris@bencrump.com

Nabeha Shaer*
Desiree Austin-Holliday*
**BEN CRUMP LAW PLLC**
633 Pennsylvania Avenue Northwest
Second Floor
Washington, DC  20004
nabeha@bencrump.com
desiree@bencrump.com

***Counsel for Plaintiffs***
***and the Proposed Classes***

*Pro hac vice* or admission forthcoming.
Attorney is "of counsel" in this matter,
in compliance with RCFC 83.1(c)(1).